1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DAN HARTMANN,

        Plaintiff,

  v.

CHRISTIAN HANSON, ELEVEN
UNKNOWN DEPUTY UNITED
STATES MARSHALS, RIVERSIDE
COUNTY, ROD PACHECO, DAVID
BRIAN GREENBERG, HAWLEE
KANE LARSON, ARMANDO MUNOZ,
CARREN ROBINSON, and DOES
1 through 10, inclusive,

        Defendants.

_____/

No. C 09-03227 WHA

**ORDER GRANTING DEFENDANT
HANSON'S MOTION TO DISMISS
AND MOTION FOR SUMMARY
JUDGMENT, AND SCHEDULING
CASE MANAGEMENT
CONFERENCE**

**INTRODUCTION**

      This case involves the alleged mistreatment of a registered sex offender's roommate who

was at his residence during the execution of an arrest warrant for his co-habitant. Defendant

Christian Hanson, one of twelve deputy United States marshals who executed the arrest warrant,

moves to dismiss (or, alternatively, for summary judgment on) all claims alleged against him in

the complaint. For the reasons set forth below, defendant Hanson's motion is **GRANTED**. Further

instructions are provided herein with respect to remaining defendants in this action.

**STATEMENT**

      Since the claims asserted against defendant Hanson comprise only half of the claims

alleged in the complaint, only those facts relevant to their adjudication will be set forth.

### 1.    ISSUANCE OF THE ARREST WARRANT

In 1998, plaintiff's roommate was convicted of engaging in unlawful sexual activity with a minor (Hanson Decl. Exh. A).  As a result of this conviction, the roommate was required, under various sections of the California Penal Code, to register with local police whenever he moved to a new residence.  On April 30, 2009, the Superior Court in the County of Riverside, California, issued an arrest warrant for the roommate, based upon his alleged failure to properly register his new residence with state authorities (*ibid.*).

Defendant Hanson, a deputy United States marshal and member of the Northern California Fugitive Task Force, received a request on May 19, 2009, from the Pacific Southwest Regional Fugitive Task Force for assistance in executing the Riverside County warrant (*id.* ¶¶ 1, 3).  Based upon investigative searches of various databases, defendant Hanson ascertained that the target of the arrest warrant was likely living at a particular residence in Guerneville, California (*id.* at ¶¶ 3–5).  Communications with the Sonoma County Sheriff in Santa Rosa, California — located a mile and a half from the identified residence — revealed that plaintiff's roommate had actually registered that particular address on April 29, 2009 (*id.* ¶ 5; Compl. ¶ 22).  The street number on the registration form, however, had been crossed out by hand and changed from "14256," the correct address where plaintiff and his roommate resided, to "12456" (Hanson Decl. ¶ 5).

### 2.    SERVICE OF THE WARRANT

Unless otherwise noted, both plaintiff's complaint and defendant's motion and supporting declarations agree on the following facts.[1]  At or around noon on May 20, 2009, numerous deputy U.S. marshals — including defendant Hanson — attempted service of the arrest warrant at the home of plaintiff and his roommate (*id.* ¶ 7; Compl. ¶ 23).  After the marshals knocked on the door of the residence, plaintiff answered the door (Hanson Decl. ¶ 7; Compl. ¶ 24).  According to defendant Hanson, just prior to plaintiff answering the door, an interior light was extinguished (Hanson Decl. ¶ 7).  Based upon descriptions of the residence provided by both parties, the door

---

[1] As will be explained shortly, plaintiff failed to file an opposition to the instant motion, and therefore this motion is being treated as unopposed.  Plaintiff's complaint is merely being cited to show that the unsworn facts therein do not differ greatly from the sworn facts set forth in defendant's declaration.

on which the marshals knocked was located on the second floor of the structure, accessible by stairs, and situated approximately 35 feet above the ground (Hanson Decl. ¶¶ 7, 8; Compl. ¶ 25). Defendant Hanson concedes in his motion that the marshals had their weapons drawn at the time plaintiff opened the door (Compl. ¶ 25; Br. 12). After plaintiff identified himself as *not* the target of the arrest warrant, he was detained by the marshals and led down the front steps of his residence away from the door (Hanson Decl. ¶ 7; Compl. ¶ 25). Thereafter, without any use of force by the marshals or resistence by plaintiff, plaintiff was placed in handcuffs (Hanson Decl. ¶ 7; *see* Compl. ¶ 25).

Once plaintiff was detained, his roommate — the target of the arrest warrant — emerged onto the entry area of the residence and was taken, also without incident, into custody (Hanson Decl. ¶ 7; Compl. ¶ 27). Officers then performed a search of the residence (Hanson Decl. ¶ 8; Compl. ¶ 29). According to defendant Hanson, the search was a standard "security sweep" of the "room which [task force] officers encountered" plaintiff and his roommate (Hanson Decl. ¶ 8).[2]

While inside the residence, the marshals noticed an itinerary, wallet, and luggage that allegedly indicated the roommate's travel plans to New York (*id.* ¶ 8). Although not mentioned in the complaint, plaintiff allegedly informed the marshals that the luggage and wallet belonged to his roommate, and that the roommate was planning to leave for New York that afternoon (*ibid.*). Based upon his "training and experience," defendant Hanson concluded that the items indicated that the roommate was planning to leave the area in violation of his registration requirements, and after consulting with Riverside County investigators and the U.S. Attorney's Office, seized those items incident to the roommate's arrest (*id.* ¶ 10). Additionally, defendant Hanson — allegedly based upon a specific request from the Riverside District Attorney's Office to seize any cellular phone "on or about [the roommate's] person" — seized the roommate's cellular phone (*id.* ¶ 9).

According to defendant Hanson, plaintiff was only handcuffed for fifteen to twenty minutes while his identity was verified and an outstanding warrant check was performed (*id.* ¶ 11). Plaintiff, however, alleged in the complaint that he was in handcuffs closer to forty-five

---

[2] Defendant Hanson's declaration and motion did not mention the existence of any search warrant or parole search condition that would have otherwise authorized this search.

minutes (Compl. ¶ 33).  Thereafter, plaintiff was told by the marshals that "he was free to leave," but that he was not permitted to reenter the residence until after the search was concluded (Hanson Decl. ¶ 11).  By both parties' estimates, the officers were at the residence for around ninety minutes total (*id.* ¶ 12; Compl. ¶¶ 33, 40).

With respect to scope of the search and seizure, plaintiff alleged that the marshals entered and searched his private quarters, which was *not* the room that was adjacent to the door of the residence (Compl. ¶ 36).  This search allegedly occurred after plaintiff informed the officers that his roommate occupied only the front room, and the rooms *behind* the front room belonged to plaintiff (*id.* ¶ 29).  Plaintiff also alleged in his complaint that the officers seized a computer that belonged to his attorney, David Wright, for whom his roommate apparently worked as a civil rights consultant and legal assistant (*id*. ¶ 38).  Again, all these allegations are unsworn.  Defendant Hanson's motion and supporting declaration, however, do not dispute or contradict these allegations, at least with respect to the search of plaintiff's private quarters.

Finally, plaintiff's complaint alleged that some of these items were, and continue to be, improperly held by defendants following their seizure (Compl. ¶¶ 41–45).  According to defendant Hanson, all property other than the phone, itinerary, and computer — which were provided to Riverside County authorities pursuant to a search warrant obtained *after their initial seizure occurred* — were returned on May 21, 2009 (Hanson Decl. ¶ 13).

*             *             *

While the facts in this litigation are intriguing, the procedural history is even more so.  To put it briefly, plaintiff and his counsel disappeared completely and without explanation from this litigation for the entire month of December 2009, failing to appear at a duty noticed case management conference on December 10, 2009, and ignoring the briefing schedule of the instant motion (Dkt. Nos. 14, 15, 17, 19, 23, 27).

Evidence of this disappearance arrived early in December 2009.  A week before the December 10 case management conference, plaintiff's counsel — Attorney David Wright — failed to meet and confer with defense counsel to draft and file their joint case management statement (Dkt. No. 22).  Indeed, at the case management conference, defense counsel indicated

that they were unable to obtain *any* response whatsoever from plaintiff's counsel leading up to the hearing.

An order was filed after the unattended case management conference, ordering plaintiff to show cause why his case should not be dismissed for lack of prosecution, and why he or his attorney should not be required to pay fees and sanctions due to their failure to appear (Dkt. No. 23). A hearing on that order was scheduled for January 7, 2010, with a written response from plaintiff (or plaintiff's counsel) due by January 4, 2010. Adding to the defaults, on December 17, 2009, the deadline for plaintiff to file a timely opposition to the instant motion passed without any submission by plaintiff. In response to this missed deadline, the hearing on the motion was vacated, and a *second* order to show cause was issued on December 18, 2009 (Dkt. No. 26). In the December 18 order, plaintiff was warned that failure to show cause and explain by December 24 why his opposition brief was not filed would result in defendant's motion being treated as unopposed. Neither plaintiff nor his counsel filed a response by December 24.

Soon into the new year, Attorney Wright filed a declaration on January 4, 2010. It was purportedly in response to both of the orders to show cause (Dkt. Nos. 28, 29). In these declarations, Attorney Wright admitted that it was his "mistake, inadvertence and negligence" that caused his non-appearance at the December 10 case management conference and his failure to file an opposition brief to the instant motion, and that he was willing to reimburse opposing counsel for their expenses related to the December 10 conference (Dkt. No. 29 ¶¶ 6, 10). Further into the submission, Attorney Wright then attempted to present and argue on the merits an opposition to defendant Hanson's opening brief (Dkt. No. 28). Additionally, Attorney Wright indicated his intention to file an amended complaint to add additional parties to the action (Dkt. No. 29 ¶¶ 8–9). In response, the undersigned ordered Attorney Wright *not* to file an amended complaint until the pending set of snafus were sorted out and express approval from the Court was given (Dkt. No. 30). Moreover, Attorney Wright was further instructed that he would be allowed to address both orders to show cause at the upcoming January 7 hearing, but that he would *not* be allowed to argue the merits of defendant Hanson's motion at that time (*ibid.*).

5

On the morning of the January 7 hearing, Attorney Wright notified the Court that he would not be in attendance due to a claimed medical emergency (Dkt. No. 32). Defense counsel was notified of this absence, and did not appear. The undersigned accepted this medical excuse and rescheduled the hearing for 8:00 A.M. on January 21, 2010 (Dkt. No. 31).

On January 21, 2010, neither plaintiff nor his attorney appeared for the rescheduled 8 A.M. hearing. The undersigned waited until 10:00 A.M. to allow Attorney Wright to arrive at the courthouse. Defense counsel also waited patiently for two hours. Attorney Wright did not appear. Nor did he phone or file any excuse. Indeed, no communications whatsoever were received by the Court or the parties from plaintiff or his counsel prior to the hearing on January 21, 2010. As of the date of this order, plaintiff has still not appeared before the undersigned to show cause why this case should not be dismissed for failure to prosecute, or why this motion should not be treated as unopposed.

With this bizarre procedural backdrop in place, the merits of defendant Hanson's motion will now be addressed.

**ANALYSIS**

As a preliminary matter, the undersigned must consider four factors to determine whether the instant motion should be treated as unopposed, or whether plaintiff has shown "excusable neglect" warranting additional time for plaintiff to explain himself. *Briones v. Riviera Hotel & Casino*, 116 F.3d 379 (9th Cir. 1997) (adopting the four-factor test set forth by the Supreme Court in *Pioneer Investment Servs. Co. v. Brunswick Assoc. Ltd. Partnership,* 507 U.S. 380 (1993)). These four factors are: (1) the danger of prejudice to the opposing party; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the person; and (4) whether the person whose "neglect" is under scrutiny acted in good faith. *Pioneer*, 507 U.S. at 395.

Here, Attorney Wright's declaration speaks for itself. In his own words, his failure to file an opposition to the instant motion was due solely to his "mistake, inadvertence and negligence" (Dkt. No. 29 ¶ 10). Thus, a timely filing was certainly within his control. Even given this failure, the undersigned was willing to allow Attorney Wright an opportunity to make his best case as to

why he should be allowed to file a late opposition, and why this case should not be dismissed. While the undersigned excused Attorney Wright for his absence at the January 7 hearing due to a medical emergency, he at least provided notice to the Court and opposing counsel of his absence that morning. The same cannot be said for the January 21 hearing. Attorney Wright — echoing his unexplained absence at the December 10 case management conference — failed to let anyone know that he would not be present. Given this history, it is unclear when, if ever, the instant motion could be ruled on without treating it as unopposed.

As such, the four *Pioneer* factors do not support a finding of excusable neglect, which would allow the Court to extend time to Attorney Wright to file his opposition. FRCP 6(b)(1)(B) ("[T]he court may, for good cause, extend the time" if a "party failed to act because of excusable neglect."). Attorney Wright's behavior has denied defendant Hanson a prompt resolution of his motion, which is clearly prejudicial. Moreover, his *second* unexplained absence at a duly noticed hearing cannot be seen as an act of good faith. Finally, Attorney Wright's absences have prevented the undersigned from setting a case management schedule and moving this action forward. As such, defendant Hanson's motion will be treated as unopposed, and ruled on accordingly.

Turning to the motion at hand, defendant Hanson presents a multi-faceted attack on plaintiffs claims. *First*, defendant asks that plaintiff's claims against defendant to be construed as claims made against the United States, which would be barred under the doctrine of sovereign immunity. *Second,* defendant asserts that plaintiff has not exhausted all administrative remedies for a tort claim against the United States under the Federal Tort Claims Act (FTCA), and therefore plaintiff's tort claims must be dismissed for lack of subject matter jurisdiction. *Third,* defendant moves for summary judgment that plaintiff's claims are otherwise barred by the doctrine of qualified immunity.

Each argument is addressed in turn.

### 1. INTERPRETATION OF CLAIMS AGAINST DEFENDANT HANSON AS SOLELY IN THEIR OFFICIAL CAPACITY

It is well established that *Bivens* created a remedy for violations of constitutional rights committed by federal officials acting in their individual capacities. In a paradigmatic *Bivens*

7

action, a plaintiff seeks to impose personal liability upon a federal official based on alleged constitutional infringements he or she committed against the plaintiff. *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157, 1173 (9th Cir. 2007) (citing *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971)). However, "a *Bivens* action can be maintained against a defendant in his or her individual capacity only, and not in his or her official capacity." *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir.1987). This is because a *Bivens* suit against a defendant in his or her *official* capacity would merely be another way of pleading an action against the United States, which is ordinarily barred by sovereign immunity. *Nurse v. United States*, 226 F.3d 996, 1004 (9th Cir.2000).

Here, defendant asks the Court to construe plaintiff's claims against Christian Hanson as being made in their official capacity (Br. 22). To justify this request, plaintiff argues that it "appears [defendant] was acting within the scope of his federal employment" based upon the allegations of the complaint (*ibid.*). Thus, "[s]ince the detention, search[,] and other actions were taken during the performance of [defendant's] official duties," the claims can be construed as being in their official capacity (*ibid.*).

This argument is unpersuasive. As defendant admits in its motion, plaintiff has expressly alleged that defendant Hanson "acted in his official *and individual* capacity to deprive [plaintiff of his constitutionally protected rights" and "he is being sued in his official *and individual* capacity" (Compl. ¶ 18) (emphasis added). This is sufficient to state a claim against a federal officer in his individual capacity. *See Nurse*, 226 F.3d at 1004 (reversing a district court's dismissal of *Bivens* claims because the complaint purported to sue the individual defendants in both their individual and official capacities). Plaintiff's motion with respect to this argument is denied.

### 2. EXHAUSTION OF ADMINISTRATIVE REMEDIES UNDER THE FEDERAL TORT CLAIMS ACT

The Federal Tort Claims Act, or FTCA, constitutes a limited waiver of sovereign immunity for claims that are based on the negligent or wrongful acts of the United States. *See* 28 U.S.C. 1346(b); 28 U.S.C. 2671 *et seq.* This includes liability for intentional torts such as assault, battery, and false imprisonment, if committed by federal law enforcement officers. *See* 28 U.S.C. 2680(h). Defendant argues that, to the extent plaintiff is suing to recover tort damages resulting

8

from defendant's decisions in this case, plaintiff has failed to exhaust his administrative remedies as required under the FTCA (Br. 23).  28 U.S.C. 2675(a).

This order agrees with defendant that plaintiff has not alleged that he properly "presented [his] claim to the appropriate Federal agency" and either waited for a written denial of his claim, or for a six-month non-response period as required under the FTCA.  *Ibid.*  Because there are no exceptions to this requirement, plaintiff's tort-related claims — to the extent that they are claims brought under the FTCA — must be dismissed for lack of subject-matter jurisdiction.  *See McNeill v. United States*, 508 U.S. 106, 111–112 (1993).

This, however, does not end the analysis.  Because the FTCA constitutes a limited waiver of the United States' sovereign immunity, it logically applies only to claims brought against defendant Hartman *in his official capacity*.  *See Nurse*, 226 F.3d at 1004.  Thus, plaintiff's failure to exhaust his administrative remedies under the FTCA (or, alternatively, his failure to plead that he did so), does not bar a *Bivens* constitutional claim involving the same allegedly tortious conduct.  Indeed, the Supreme Court explicitly held that claims allowed against the United States under the FTCA were meant to *complement* claims brought against the individual officials alleged to have infringed the plaintiff's constitutional rights.  *Carlson v. Green*, 446 U.S. 14, 20 (1980).  Plaintiff's claims, therefore, to the extent that they allege constitutional violations under *Bivens* by defendant Hartman in his individual capacity, cannot be dismissed under this theory.

Finally, it should be noted that plaintiff alleged violations of *both* the federal and state constitutions (Compl. ¶¶ 94, 99).  Where such constitutional tort claims are made against federal officers, alleged violations of the federal constitution are treated as *Bivens* claims, while alleged violations of the state constitution are treated as FTCA claims.  *Papa v. United States*, 281 F.3d 1004, 1010 n.20 (9th Cir. 2002).  Thus, like plaintiff's FTCA claims discussed above, the claims made against defendant Hanson under the California Constitution must also be dismissed.

### 3.    QUALIFIED IMMUNITY

Since plaintiff's *Bivens* claims against defendant Hanson cannot be dismissed under the theories just discussed, defendant moves in the alternative for summary judgment that plaintiff's *Bivens* claims are barred by the doctrine of qualified immunity.

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). An issue is "genuine" only if there is sufficient evidence for a reasonable fact-finder to find for the non-moving party, and "material" only if the fact may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986). All reasonable inferences must be drawn in a light most favorable to the non-moving party. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004). Because plaintiff — the non-moving party — has failed to file an opposition, so long as defendant can meet its burden producing evidence negating an essential element of plaintiff's claims *or* can show that plaintiff lacks sufficient evidence of an essential element to carry its ultimate burden of persuasion at trial, the moving party is entitled to judgment as a matter of law. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

In determining at summary judgment whether claims against a federal officer are barred by qualified immunity, the district court — viewing the *sworn* facts in a light most favorable to the non-moving party — must ask: (1) did the officer's conduct violate a constitutional right; and (2) if a violation occurred, whether the right was "clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). While these questions are traditionally addressed in that order, the district court may "exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Each *Bivens* claim against defendant Hanson will now be discussed.

### A. UNCONSTITUTIONAL DETENTION OF PLAINTIFF

Plaintiff alleges in his complaint that defendant Hanson arrested, handcuffed, and refused to allow plaintiff to enter his own residence without either an arrest warrant or search warrant for plaintiff, and that these actions were in violation of the Fourth Amendment (Compl. ¶ 86). The complaint also alleges, and defendant concedes, that defendant knew that plaintiff was not the target of the arrest warrant, because plaintiff identified himself at the door of his residence and

defendant had seen photographs of plaintiff's roommate prior to executing the arrest warrant (*ibid.*; Br. 9). Regardless, according to defendant Hanson, plaintiff was detained in order to ascertain his identity and preserve officer safety while executing the arrest warrant (Br. 9). Plaintiff does not proffer any reasons why he was handcuffed, but merely alleges that he was handcuffed for forty-five minutes rather than fifteen to twenty minutes as stated by defendant Hanson in his declaration (Compl. ¶ 33; Hanson Decl. ¶ 11).

As a preliminary matter, defendant concedes that "it is undisputed that the [m]arshals' detention of [p]laintiff was a seizure" under the Fourth Amendment (Br. 9). Once a seizure is found, the court must "evaluate the detention's constitutionality by considering the totality of the circumstances at that point." *See Ramirez v. City of Buena Park,* 560 F.3d 1012, 1020-21 (9th Cir. 2009). The factors considered typically include weighing individual privacy rights with "substantial law enforcement interests," including the "law enforcement interest in exercising unquestioned command of the situation" to protect themselves and others present. *Michigan v. Summers*, 452 U.S. 692, 699, 703 (1981).

As a general and well-established proposition, officers may detain a building's occupants during the execution of a search or arrest warrant so long as "the officer conducts the detention in a reasonable manner." *Dawson v. City of Seattle*, 435 F.3d 1054, 1066 (9th Cir.2006) (citing *Muehler v. Mena*, 544 U.S. 93 (2005)); *Tekle v. United States*, 511 F.3d 839, 848 (9th Cir. 2007) (extending *Muehler*, which involved a search warrant, to the execution of arrest warrants). In *Muehler*, the Supreme Court held that the handcuffing of a small, barefoot woman for two to three hours was reasonable, given that the search warrant for her home sought dangerous weapons used in gang activity, and only two officers were present to oversee four detainees. "[Law enforcement officials] do not, however, have unfettered authority to detain a building's occupants in any way they see fit." *Dawson*, 435 F.3d at 1066. Indeed, the Ninth Circuit recently held that it was unreasonable to handcuff a barefoot 11-year-old boy (who was neither resisting arrest or attempting to flee) for ten to fifteen minutes outside his residence while effectuating his father's *arrest* warrant, while a force of approximately twenty-three officers managed the scene. *Tekle*, 511 F.3d at 848. The *Tekle* decision expressly distinguished *Muehler* by noting that while both

11

seizures involved the use of handcuffs, in *Muehler* "they were used on adults in a situation where the officers were outnumbered by the detainees." *Id.* at 849. Moreover, it was apparent at the time of the seizure that the child in *Tekle* was not the subject of the arrest warrant, and there was no suspicion that there were deadly weapons or "armed and dangerous" individuals on the premises. *Id.* at 849–50.

Here, plaintiff, an adult male, was handcuffed for only fifteen to twenty minutes.[3] Once plaintiff's handcuffs were removed, however, plaintiff was told by officers that he was "free to leave." (Hanson Decl. ¶ 11). This effectively ended the seizure, despite the fact that plaintiff voluntarily choose to remain in the area. *See Fisher v. City of San Jose*, 558 F.3d 1069, 1077 (9th Cir. 2009) (holding that a Fourth Amendment seizure ends when a reasonable person, based on the totality of the circumstances, would feel at liberty to leave). Additionally, it is undisputed that there were twelve marshals present at the scene, and the marshals *knew* at the time they handcuffed plaintiff that he was not the target of the arrest warrant.

As such, the factual situation presented by this case falls squarely between the guideposts of *Muehler* and *Tekle*. On one hand, the arrest warrant was targeting a seemingly non-violent sex offender who did not present to officers the same "armed and dangerous" gang-related situation in *Muehler*. Additionally, unlike the situation in *Muehler*, the twelve armed federal marshals vastly outnumbered plaintiff and his roommate. On the other hand, while the marshals knew plaintiff was not the suspect, they did not immediately know his identity, and it was apparent he was not a child as in *Tekle*. Furthermore, plaintiff was only handcuffed for fifteen to twenty minutes, far less than the two or three hours found to be reasonable in *Mueller*.[4] Finally, because plaintiff emerged from the residence first, at least some of the time that plaintiff was handcuffed was spent by officers (1) ascertaining the whereabouts of plaintiff's roommate, (2) arresting plaintiff's roommate, (3) performing a security sweep of the residence, and (4) confirming plaintiff's identity and running a background check for outstanding warrants. Under the general principle

---

[3] Defendant Hanson's version of the facts must be accepted as true for the purposes of this order, since they are the only facts supported by a sworn declaration.

[4] Even if plaintiff was handcuffed for forty-five minutes, as alleged in the complaint, this is far shorter than the time period found reasonable in *Mueller*.

set forth in *Michigan v. Summers* that officers should exercise "unquestioned command" of the situation to maintain the safety of all who are present, it seems plainly reasonable for an unidentified adult male to be detained for fifteen minutes, or even forty-five minutes, while these activities are bring performed by law enforcement.  452 U.S. at 703.

While the undersigned could reach the merits of whether plaintiff's claim alleges a violation of his Fourth Amendment rights, this unnecessary under *Pearson v. Callahan*.  The very fact that the circumstances of this case fall squarely within the gray area between *Muehler* and *Tekle* indicates that the right asserted by plaintiff was not "clearly established in light of the specific context of the case." *Pearson*, 129 S.Ct. at 818.  Under *Pearson*, qualified immunity may be granted without an express finding that a constitutional violation has been alleged, so long as the court finds that the right was not clearly established.  *Ibid.*  As such, defendant's motion to bar plaintiff's constitutional claim for unlawful seizure and detention under the doctrine of qualified immunity is granted.

### B.    USE OF EXCESSIVE FORCE BY DEFENDANT

Although listed in his complaint as a claim for "assault and battery," plaintiff alleges that the handcuffs used by defendant Hanson caused bilateral bruising to his wrists, and pain to his neck, shoulder, and back (Compl. ¶ 23).  Plaintiff also alleges that, in the process of being detained, he faced "several handguns and an automatic rifle pointing to his head and chest" (*Id.* ¶ 25).  These factual allegations are sufficient to allege a *Bivens* claim for excessive force under the Fourth Amendment.  *Carlson*, 446 U.S. at 20.

Allegations of excessive force are examined under the Fourth Amendment's prohibition on unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394 (1989).  As in the prior section, the court must ask "whether the officers' actions were 'objectively reasonable' in light of the facts and circumstances confronting them," and balance "'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396.  Stated another way, the court should  "balance the amount of force applied against the need for that force." *Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir.2003).  The first factor in determining whether the force used was excessive is the severity of the force applied.

*Tekle*, 511 F.3d at 844 (citation omitted). The second factor is the need for the force. Considerations in determining the need for the force include (1) the severity of the crime at issue, (2) whether the individual poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight.

Starting with the need for the force first, it is undisputed that plaintiff did not actively resist arrest or attempt to evade arrest when detained by the U.S. marshals (Hanson Decl. ¶ 7). Additionally, the severity of the crime at issue — failure to register as a sex offender — does not appear to be a crime that would traditionally justify a heightened need for force when executing an arrest warrant, especially since defendant Hanson was aware that plaintiff's roommate had actually registered with the local authorities.[5] The only reasons cited by defendant to justify the need for the twelve officers to have their guns drawn and pointed at plaintiff when he answered the door were (Br. 12–13):

> The Marshals were uncertain about whom, or how many individuals, they would encounter at the residence and whether or not the occupants would cooperate. Given the level of heightened suspicion, officers acted reasonably in having their guns drawn when an unknown individual answered the door to the residence. Officers did not know if Plaintiff was armed, nor whether Plaintiff may pose a threat to officer safety.
>
> . . .
>
> [A]lthough Plaintiff came to the door alone, Plaintiff could have been armed and a large number of individuals may have been awaiting inside the residence.

With respect to the severity of force, it is well established that pointing of a gun at someone may constitute excessive force, even if it does not cause physical injury. *See Robinson v. Solano County*, 278 F.3d 1007, 1014-15 (9th Cir. 2002) (en banc); *Tekle*, 511 F.3d at 847 ("We have held since 1984 that pointing a gun at a suspect's head can constitute excessive force in this circuit."). In *Robinson*, the Ninth Circuit noted that "point[ing] guns at people not under suspicion, handcuff[ing] them and detain[ing] them for 25 minutes" could amount to a Fourth Amendment violation because "the use of guns and handcuffs must be justified by the

---

[5] While the registration form contained what appeared to be a purposefully doctored street address, the level of suspicion created by this anomaly does not, without more, justify a heightened need for force.

14

1  circumstances." *Id.* at 1014 (citations omitted).  In *Robinson*, the Ninth Circuit eventually held

2  that a constitutional violation was alleged by plaintiff, because "[t]he crime under investigation

3  was at most a misdemeanor, the suspect was apparently unarmed and approaching the officers in

4  a peaceful way, there were no dangerous or exigent circumstances apparent at the time of the

5  detention, and the officers outnumbered the plaintiff." *Ibid.*  Thus, the court held that the officers

6  were not justified in drawing their guns and pointing them at the suspect's head from close range.

7       Here, defendant Hanson admits that the marshals had their guns drawn when plaintiff

8  answered the door of his residence, and does not dispute plaintiff's allegation that he was

9  "suddenly facing several handguns and an automatic rifle pointing to his head and chest" (Br. 12).

10  What is unclear, however, is how long officers kept their weapons drawn and pointed at plaintiff

11  after it became apparent that he was unarmed and cooperative.  No sworn facts in the record

12  speak to these questions.

13       Considering the sworn facts provided by defendant and the circumstances at the time of

14  plaintiff's detention, this order holds that plaintiff has not alleged a constitutional violation of the

15  Fourth Amendment due to "excessive force" by federal officers.  At the time plaintiff answered

16  the door, officers had what they believed to be a valid arrest warrant for the residence, and were

17  unaware of how many individuals were inside the residence, who would answer the door, and

18  whether that person might be armed.  Moreover, the fact that the lights within the residence were

19  turned off shortly after officers knocked and announced their presence provides an additional

20  justification for their suspicion and caution (Hanson Decl. ¶ 7).  Because of the unknown danger

21  faced by law enforcement when executing an arrest warrant at a residence, this order finds that the

22  defendant's conduct with respect to his firearm was objectively reasonable.[6]  As such, qualified

23  immunity will bar this claim.

24       With respect to injuries allegedly suffered by plaintiff due to being "handcuffed for a long

25  period of time," plaintiff did not complain that the handcuffs were too tight, or request that

26

27       [6] It should be noted, however, that if sworn facts had demonstrated that defendant
Hanson had kept his weapon drawn and pointed at plaintiff *after* it was determined that
28  plaintiff was unarmed, cooperative, and not a serious threat to officer safety, this holding
would likely be different under *Robinson*.

1  defendant loosen or readjust them (Br. 12). Since it has already been determined that plaintiff's

2  detention — which includes being handcuffed for fifteen minutes — does not violate any clearly

3  established constitutional right, this claim must similarly yield to defendant's qualified immunity.

4  In sum, plaintiff's claim of excessive force is barred by the doctrine of qualified immunity.

5  **C.   UNCONSTITUTIONAL SEARCH & SEIZURE OF PLAINTIFF'S RESIDENCE**

6      The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

7  houses, papers, and effects, against unreasonable searches and seizures...." U.S. CONST. AMEND.

8  IV. One of the basic principles of Fourth Amendment law is that searches and seizures inside a

9  home without a warrant are presumptively unreasonable. *Welsh v. Wisconsin*, 466 U.S. 740, 749

10 (1984) (citation omitted). However, because the touchstone of the Fourth Amendment is

11 "reasonableness," the court must nevertheless weigh the degree to which a search intrudes upon

12 an individual's privacy with the degree to which it is needed for the promotion of legitimate

13 governmental interests, such as officer safety. *United States v. Knights*, 534 U.S. 112, 118-19

14 (2001).

15     A creature of this balancing test is the "protective sweep" rule. *Maryland v. Buie*, 494

16 U.S. 325, 334 (1990). In *Buie*, the Supreme Court gave great weight to the "interest of the

17 [arresting] officers in taking steps to assure themselves that the house in which a suspect is being,

18 or has just been, arrested is not harboring other persons who are dangerous and who could

19 unexpectedly launch an attack," and described two types of searches that might immediately

20 follow an arrest and for which a warrant was not required. *Id.* at 333-34. *First*, the officers'

21 interest in their own safety justifies a search "incident to the arrest ... as a precautionary matter

22 and without probable cause or reasonable suspicion, ... [of] closets and other spaces immediately

23 adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334.

24 *Second*, the officers can perform a further protective sweep beyond immediately adjoining areas

25 when there are "articulable facts which, taken together with the rational inferences from those

26 facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed]

27 an individual posing a danger to those on the arrest scene." *Ibid.* This "protective sweep,"

28 however, is not a license to search every nook and cranny of a house. Rather, it is subject to two

16

significant limitations: it "extend[s] only to a cursory inspection of those spaces where a person may be found" and lasts "no longer than it takes to complete the arrest and depart the premises." *Id.* at 335-36.

Here, both plaintiff's complaint and defendant's sworn declaration indicate that the target of the arrest warrant — plaintiff's roommate — was arrested immediately after he came to the entry area of his residence (Compl. ¶ 27; Hanson Decl. ¶ 7). Because the lights were turned off in the residence shortly before plaintiff opened the door, however, it was reasonable for the marshals to conclude that the front room of the residence (adjacent to the door) was an area "from which an attack could be immediately launched," and where at least one person could have been concealed. *Buie*, 494 U.S. at 334. Therefore, defendant Hanson and other deputy U.S. marshals were authorized to enter and perform a "protective sweep" of the adjoining room without any probable cause or reasonable suspicion. *See United States v. Lemus*, 582 F.3d 958, 963 (9th Cir. 2009) (citing *Buie* and holding that because the suspect in the case was arrested in an area "immediately adjoining" the living room, a limited search of that room was proper without either reasonable suspicion or probable cause).

With respect to the items seized from the residence, due to the lack of a proper search warrant, seizure of items discovered during a protective sweep requires that the items fall within the "plain view" exception. As stated in *United States v. Stafford*, "[t]o fall within the plain view exception, two requirements must be met: the officers must be lawfully searching the area where the evidence is found and the incriminatory nature of the evidence must be immediately apparent." 416 F.3d 1068, 1076 (9th Cir. 2005) (citations omitted). According to defendant Hanson, all items seized from plaintiff's residence were discovered in plain view within the front room of the residence (Hanson Decl. ¶¶ 8–9). Taking defendant's sworn facts as true, however, it is doubtful whether the incriminatory nature of the evidence was "immediately apparent" as required under *Stafford*.

In *Arizona v. Hicks*, the Supreme Court held invalid the seizure of stolen stereo equipment found by police while executing a valid search for other evidence. 480 U.S. 321 (1987). Although the police were lawfully on the premises, they obtained probable cause to believe that

the stereo equipment was contraband only after moving the equipment to permit officers to read its serial numbers. Thus, it's incriminating nature was not immediately apparent without further searching — on its face, it was simply a stereo. In the Ninth Circuit, even a gun may not be seized unless it has an "immediately apparent" incriminating nature. In *United States v. Lemus*, seizure of a gun under the "plain view" doctrine was only permitted because the police officer who seized the gun was present during the prior probationary search of the suspect's apartment, and *knew* that the suspect had been convicted of a felony. 582 F.3d 958. Because it is illegal for a felon to possess a firearm, the incriminating nature of the pistol was immediately apparent. With respect to incriminating documents, a number of courts of appeals have held that a plain-view seizure of certain documents is permissible even though their incriminating nature is not apparent absent *some* reading of their contents. *See Crouch v. United States*, 454 U.S. 952, 955-956 (1981) (dissenting from denial of certiorari) (listing cases).

Here, defendant Hanson seized a wallet, papers, luggage, and a cellular phone. The luggage contained numerous items, including a laptop and clothing (Compl. ¶ 88; Hanson Decl. ¶ 13). Of these items, however, plaintiff only asserts a property interest in the cellular phone (Compl. ¶¶ 38, 45). The laptop apparently belongs to Attorney David Wright, and the other items belong to plaintiff's roommate (Compl. ¶¶ 88, 89). Under these facts, plaintiff lacks standing to challenge any of these seizures except for the cellular phone, since he admittedly does not own or have a legitimate expectation of privacy in the other seized items. *See United States v. Parks*, 285 F.3d 1133 (9th Cir. 2002) (standing to challenge the legality of a search or seizure requires a demonstration that the challenger demonstrate a legitimate expectation of privacy in the items seized). Therefore, the circumstances surrounding the seizure of the wallet, itinerary, and luggage need not be addressed.

With respect to the phone, however, since defendant Hanson did not seize this item pursuant to a valid search warrant supported by probable cause, its seizure — unless the "plain view" exception applies — was presumptively unreasonable. *Welsh*, 466 U.S. at 749. The facts provided by defendant Hanson in his declaration do not support the conclusion that the cellular phone was immediately incriminating on its face. *First*, unlike firearms and felons, it is certainly

1    not illegal for a registered sex offender to possess a cell phone. *Second*, despite defendant

2    Hanson's claim that he was "previously informed by the Riverside SAFE Task Force, through a

3    collateral lead request, that a cellular phone has been used by [plaintiff's roommate] in the

4    commission of his registration violations and was possible evidence of such violations," this does

5    not vitiate the need for law enforcement to apply for and obtain a search warrant supported by

6    probable cause (Hanson Decl. ¶ 9). *Third*, just because the "lead investigator from the Riverside

7    District Attorney's Office had requested that any cellular phone on or about [plaintiff's

8    roommate] . . . be seized" does not authorize defendant Hartman to do without obtaining a search

9    warrant. *Fourth*, the after-the-fact issuance of a search warrant for the cellular phone — nearly a

10   week after the phone had been seized — does not remedy the initial unauthorized seizure. As

11   such, plaintiff has alleged a constitutional violation with respect to the seizure of his cellular

12   phone.

13        Finally, defendant Hanson's extension of the protective sweep from the front room to

14   plaintiff's bedroom required "articulable facts which, taken together with the rational inferences

15   from those facts, would warrant a reasonably prudent officer in believing that the area to be swept

16   harbor[ed] an individual posing a danger to those on the arrest scene." *Buie*, 494 U.S. at 334.

17   Here, besides the fact that the lights of the residence were turned off before plaintiff answered the

18   door, there were no articulable facts to support the extension of the protective sweep beyond the

19   room adjacent to the entryway of the residence. The reasons provided by defendant to search

20   plaintiff's room were as follows (Br. 19):

21            In the present case, officers were executing the arrest warrant for a
              known sex offender in violation of the lifetime requirements
22            connected to a 1998 conviction. Additionally, [plaintiff's
              roommate] was known to be currently investigated for additional
23            lewd and lascivious acts with minors in Riverside County. He was
              a convicted felon who, based on his violation of the registration
24            requirements, was trying to avoid being located by the authorities.
              Upon arrival at the residence, officers were met with two
25            individuals at the door and a [sic] unexplained outage of an interior
              light.
26
27   None of these reasons, especially in light of the admittedly cooperative nature of plaintiff and his

28   roommate, support the conclusion that a reasonably prudent officer would believe that the

     plaintiff's bedroom harbored an individual posing a danger to those on the arrest scene.

In light of the above analysis, plaintiff has alleged constitutional violations pertaining to the search and seizure of items following the arrest of his roommate. Moreover, each of the rights that were allegedly violated were "clearly established in light of the specific context of the case." Specifically, it is clearly established under *Buie* and *Hicks* that: (1) any seizure of items without a search warrant is presumptively unreasonable, and the "plain view" exception only applies if an item's incriminating nature is immediately apparent, and (2) the extension of a protective sweep beyond the room adjacent to the point of arrest requires "articulable facts" which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbored an individual posing a danger to those on the arrest scene. As such, defendant cannot claim qualified immunity with respect to the seizure of the cellular phone during the execution of the protective sweep, or the search of plaintiff's bedroom.

Despite this finding, however, plaintiff's last surviving claim against defendant Hanson must nonetheless be dismissed. Defendant Hanson filed this motion on November 24, 2009, seeking a *prompt* resolution of this matter. As the procedural history of this action amply illustrates, plaintiff then completely neglected to prosecute this case. After failing to appear at a duly noticed case management conference, plaintiff was then ordered on December 10, 2009, to show cause why this case should not be dismissed under FRCP 41(a) for failure to prosecute. Meanwhile, counsel failed to file any opposition to defendant Hanson's motion. Despite being given ample opportunities to explain this failure and seek leave to file a late opposition, plaintiff failed to appear before the undersigned to make his case. As such, this last surviving Fourth Amendment claim against defendant Hanson shall be dismissed with prejudice pursuant to FRCP 41(a).

### CONCLUSION

For the reasons discussed above, plaintiff's *Bivens* claims against defendant Hanson for unlawful detention and excessive force are barred under the doctrine of qualified immunity, and therefore defendant's motion for summary judgment on these claims must be **GRANTED**. Additionally, because plaintiff failed to exhaust his administrative remedies under the FTCA, defendant Hanson's motion to dismiss plaintiff's FTCA and California Constitution claims must

be **GRANTED**.  Finally, while plaintiff has sufficiently alleged violations of clearly established constitutional rights against defendant Hanson for the search of his residence and seizure of his cellular phone, these claims must be **DISMISSED WITH PREJUDICE** under FRCP 41(a), since plaintiff has failed repeatedly to prosecute these claims, despite given ample opportunity to do so. As such, no claims against Defendant Hanson survive this order.

This ruling, however, will remain provisional until **THURSDAY, FEBRUARY 4, 2010**. Plaintiff will be given one last opportunity to file a declaration by **NOON ON WEDNESDAY, FEBRUARY 3, 2010**, explaining why this order should not become effective on February 4, and why he did not appear *again* at a duly noticed, court-ordered hearing.

As to the remaining defendants in this action, a case management conference is hereby scheduled for **11 A.M. ON FEBRUARY 4, 2010**, and Attorney Wright is ordered to attend.  As agreed (and is warranted with or without agreement), plaintiff is ordered to pay all costs incurred by defense counsel due to plaintiff's failure to appear at the case management conference on December 10, 2009, in the amount of $2494.57, which this order finds were reasonably incurred by defense counsel in attending the aborted December 10 case management conference (Moon Decl. ¶ 2).  Plaintiff must file proof of complete payment of these costs **BY NOON ON FEBRUARY 3, 2010**.  If plaintiff does not pay these costs by that date, the Court will very likely dismiss all remaining claims in this action under FRCP 41(a).  This order is without prejudice to a requirement for plaintiff to pay even more for subsequent failures to attend.


**IT IS SO ORDERED.**


Dated: January 22, 2010.

_____
WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE